# ADVERSARY PROCEEDING COVER SHEET
(Instructions on Reverse)

**ADVERSARY PROCEEDING NUMBER**
(Court Use Only)

7376U

---

**PLAINTIFFS**

MADISON PLAZA ASSOCIATES and
MADISON AVENUE LAND LIMITED PARTNERSHIP

**DEFENDANTS**

LLIW LLC

1A

98/8086A

---

**ATTORNEYS** (Firm Name, Address, and Telephone No.)

ANGEL & FRANKEL, P.C.
460 PARK AVENUE
NEW YORK, NY 10022
(212) 752-8000

**ATTORNEYS** (If Known)

BACKENROTH + GROSSMAN, LLP
885 SECOND AVENUE
NEW YORK, NY 10017
(212) 593-1100

---

**PARTY** (Check one box only)   ☑ 1 U.S. PLAINTIFF   ☐ 2 U.S. DEFENDANT   ☐ 3 U.S. NOT A PARTY

---

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

OBJECTION TO CLAIM, RECOVERY OF PREFERENTIAL TRANSFER, EQUITABLE
SUBORDINATION AND MONEY DAMAGES

11 USC §§ 502, 547, 510, 550, 105
28 USC §§ 157, 1334

DOCKETED
JAN 22 1998
U.S. BANKRUPTCY COURT
SO. DIST. OF NEW YORK

---

## NATURE OF SUIT
(Check the one most appropriate box only.)

☐ 454 To Recover Money or Property
☑ 435 To Determine Validity, Priority, or Extent of a Lien or Other Interest in Property
☐ 458 To obtain approval for the sale of both the interest of the estate and of a co-owner in property
☐ 424 To object or to revoke a discharge 11 U.S.C. §727

☐ 455 To revoke an order of confirmation of a Chap. 11 or Chap. 13 Plan
☐ 426 To determine the dischargeability of a debt 11 U.S.C. §523
☐ 434 To obtain an injunction or other equitable relief
☐ 457 To subordinate any allowed claim or interest except where such subordination is provided in a plan

☐ 456 To obtain a declaratory judgment relating to any of foregoing causes of action
☐ 459 To determine a claim or cause of action removed to a bankruptcy court
☐ 498 Other (specify)

---

**ORIGIN OF PROCEEDINGS**
(Check one box only.)

☑ 1 Original Proceeding
☐ 2 Removed Proceeding
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another Bankruptcy Court

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

---

**DEMAND**

NEAREST THOUSAND
$ 1,000,000

OTHER RELIEF SOUGHT
SUBORDINATION OF CLAIM

☐ JURY DEMAND

---

**BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES**

NAME OF DEBTOR
MADISON PLAZA ASSOCIATES

BANKRUPTCY CASE NO.
96 B 43547  (CB)

DISTRICT IN WHICH CASE IS PENDING
SOUTHERN

DIVISIONAL OFFICE

NAME OF JUDGE
BLACKSHEAR

---

**RELATED ADVERSARY PROCEEDING (IF ANY)**

| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
|---|---|---|
| | | |

| DISTRICT | DIVISIONAL OFFICE | NAME OF JUDGE |
|---|---|---|
| | | |

---

**FILING FEE** (Check one box only.)   ☑ FEE ATTACHED   ☐ FEE NOT REQUIRED   ☐ FEE IS DEFERRED

---

DATE
1/20/98

PRINT NAME
BRUCE FRANKEL

SIGNATURE OF ATTORNEY (OR PLAINTIFF)
Bruce Roby

ANGEL & FRANKEL, P.C.
Attorneys for Debtors
460 Park Avenue
New York, New York 10022-1906
(212) 752-8000
Bruce Frankel, Esq. (BF-9009)
Jeffrey K. Cymbler, Esq. (JC-3261)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
In re:

MADISON PLAZA ASSOCIATES AND
MADISON AVENUE LAND LIMITED
PARTNERSHIP,

                Debtors.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
MADISON PLAZA ASSOCIATES AND
MADISON AVENUE LAND LIMITED
PARTNERSHIP,

                Plaintiffs

v.

LLIW LLC,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**98 / 80864**

Chapter 11
Case Nos.    96 B 43547 (CB)
           and    96 B 43548
           (Jointly Administered)

Adv. Pro. No. _____

## COMPLAINT OBJECTING TO CLAIM, FOR RECOVERY OF PREFERENTIAL TRANSFER, FOR EQUITABLE SUBORDINATION AND FOR MONEY DAMAGES

      The complaint of Madison Plaza Associates ("Associates") and Madison Plaza Land Limited

Partnership ("Land"), debtors in the above-captioned Chapter 11 cases (collectively, the "Plaintiffs"

or "Debtors"), by their attorneys, Angel & Frankel, P.C., respectfully alleges:

FILED
JAN 2 1 1998
U.S. BANKRUPTCY COURT
SO. DIST. OF NEW YORK

13.     The statutory predicates for the relief sought herein are sections 502(b), 547, 510, 550 and 105 of the Bankruptcy Code and Rules 3007, 7001(1) and 7008 of the Bankruptcy Rules.

14.     Bankruptcy Rule 3007 provides as follows:

> An objection to the allowance of a claim shall be in writing and filed. A copy of the objection with notice of the hearing thereon shall be mailed or otherwise delivered to the claimant, the Debtors or the Debtors-in-possession and the trustee as least 30 days prior to the hearing. If an objection to a claim is joined with a demand for relief of a kind specified in Rule 7001, it becomes an adversary proceeding.

15.     Pursuant to paragraph 19(e) of the Confirmation Order[1]

> [t]he Bankruptcy Court. . . retain[ed] exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan including, but not limited to . . .

> (e) to hear and determine any and all objections to the allowance or estimation of Claims filed, both before and after the Confirmation Date, including objections to the classification of any Claim or Interest, and to allow or disallow any Disputed Claim, in whole or in part . . .

### First Claim for Relief — Objection to LLIW Claim

## I.     LLIW'S CLAIM SHOULD BE RECLASSIFIED FROM SECURED TO PARTIALLY SECURED AND PARTIALLY UNSECURED

### A.     LLIW Has Repeatedly Admitted That Its Claim Against The Debtors Is Undersecured

16.     Ever since LLIW purchased Blockfront's claim against the Debtors, LLIW has contended that it holds an undersecured claim against the Debtors' estates. Not only has counsel

---

[1] Reference made herein to the "Confirmation Order" is reference to such actual order as a *conditional* order, as entered, which provides that it can be vacated. Moreover, the Court has stated and counsel for LLIW acknowledged at a hearing held on January 8, 1998 that the Court could *always* modify its own orders.

for LLIW so represented to the Court but, indeed, LLIW's pleadings filed with the Court are replete with and admit the same.[2]

17.     First, in its Disclosure Statement dated August 4, 1997 (relevant page copies of which are annexed hereto as <u>Exhibit "C"</u>), LLIW admitted that "the value of the Property is substantially less than LLIW's Claim." Disclosure Statement at ¶ 21.  LLIW even quantified how woefully undersecured it really is.  LLIW stated that its claim "is in excess of $81,000 [sic] of which <u>at least $55 million is secured</u>." Disclosure Statement at ¶ 20 (emphasis added).  LLIW further admitted that ". . . LLIW has an Unsecured Claim of up to approximately $26 million, because the value of the Property is less than LLIW's claim." Disclosure Statement at ¶ 21.

18.     Second, the Debtors filed objections to LLIW's first such Disclosure Statement. LLIW served and filed a Reply to Objections to Disclosure Statement (the "Reply to Objections"). Attached as exhibits to such Reply to Objections were an Amended Disclosure Statement and an Amended Plan of Reorganization (relevant page copies of which are annexed hereto as <u>Exhibit "D"</u>). Such Amended Disclosure Statement continues LLIW's succession of admissions.  LLIW admitted that: "Since the value of the Plaza Property is substantially less than LLIW's claim . . .  In addition, LLIW has an Unsecured Claim equal to the difference between the value of the Plaza Property and LLIW's Claim.  LLIW waives its right to distribution as a Plaza Class Four Creditor . . . ." Amended Disclosure Statement at ¶ 25. Identical language is used in the same Amended Disclosure Statement at ¶ 43 when describing the treatment of Unsecured Claims in the Land case.  LLIW has .waived its right to distribution of its admitted Unsecured Claim!

---

[2]  It should be noted that LLIW's predecessor-in-interest also admitted that it was undersecured.  In paragraph 31 of the Objection of Blockfront Equities LLC to Debtors' Application for Extension of Their Exclusive Periods, dated November 4, 1996, Blockfront stated that "[t]he Debtors here have only one secured creditor that is not an insider, Blockfront, and it is undisputed that Blockfront will be able to control the votes of the secured <u>and</u> <u>unsecured</u> creditors in these cases."  (Emphasis added).

19.    Third, two months later, in its Joint Amended Disclosure Statement, dated October

10, 1997 (the "Joint Amended Disclosure Statement") (relevant page copies of which are annexed

hereto as Exhibit "E"), LLIW stated as follows with regard to its Joint Amended Plan of

Reorganization, dated October 10, 1997 (the "Joint Amended Plan") for Associates:

> Since the value of the Plaza Property is substantially less than LLIW's Claim,
> Plaza Class Four Claims include all Plaza General Unsecured Claims, as well
> as all secured Claims that are subordinate to LLIW's Claim that have
> recourse against the Debtor.

Joint Amended Disclosure Statement ¶ 29 at p. 11 (Emphasis added).  Likewise, with regard to its

Joint Amended Plan for Land,  LLIW stated in its Joint Amended Disclosure Statement as follows:

> Since the value of the Land Property is substantially less than LLIW's Claim,
> Land Class Four Claims include all Land General Unsecured Claims, as well
> as all secured Claims that are subordinate to LLIW's Claim that have
> recourse against the Debtor.

Joint Amended Disclosure Statement ¶ 47 at p. 20 (Emphasis added).  Virtually identical language

found its way into an earlier version of LLIW's Joint Amended Disclosure Statement dated

September __, 1997.  No date was specified.  The Joint Amended Disclosure Statement was

approved pursuant to order of this Court dated October 27, 1997.  Having sought approval of its own

Joint Amended Disclosure Statement containing this express language, LLIW may not now take an

inconsistent position.  Judicial estoppel mandates this result.  LLIW represented this position to the

Court and to all parties in interest.

20.    Fourth, in the Financial and Liquidation Analyses contained in LLIW's Joint

Amended Disclosure Statement, LLIW admits twice that were the Debtors to be liquidated there

would not be any funds remaining for distribution to priority or unsecured creditors.

> Were the Plaza Debtor to be liquidated, it is likely that only LLIW would
> receive a distribution from the Plaza Debtor.

Joint Amended Disclosure Statement, Exhibit "E," at ¶ 41 at p. 17.

> Were the Land Debtor to be liquidated, it is likely that only LLIW would receive a distribution from the Land Debtor.

Joint Amended Disclosure Statement, Exhibit "E," at ¶ 59 at p. 26.

21. Fifth, in its Joint Amended Plan (relevant page copies of which are annexed hereto as Exhibit "F."), LLIW classifies its secured claims against each of the Debtors as a Class Three Claim and states that such claim is "impaired" under its Plan. *See* Exhibit F at ¶¶ 3.4 and 6.4.

22. Sixth, in August of 1996, LLIW's predecessor-in-interest, Blockfront, commissioned an appraisal of the value of the Debtors' property from CB Commercial Real Estate Group, Inc. ("CB"). CB issued an appraisal report dated August 20, 1996 (the "CB Appraisal") in which it concluded that using an income valuation approach the market value of the fee simple interest subject to existing leases in the Debtors' property was $41,000,000 and that the underlying land value given the potential redevelopment of the site when the market justifies construction assuming fee simple ownership was $55,000,000 -- i.e., no where near the $84,000,000 that LLIW now claims. LLIW itself adopted these values. In its first Disclosure Statement, LLIW acknowledged that "Pursuant to an appraisal by CB Commercial Real Estate Group, the Property has a value of approximately $55 million as of March 1997." Disclosure Statement, Exhibit "C," at ¶ 13. And LLIW goes on to enforce that fact by adding: "Accordingly, it is likely that if LLIW were to complete its foreclosure action, there would be no distribution for Unsecured Creditors in this case." Disclosure Statement at ¶ 13.

23. Seventh, at Blockfront's request, on March 25, 1997 --less than four months prior to LLIW's purchase of its Claim from Blockfront -- CB issued an Addendum to its Appraisal (relevant

page copies of which are annexed hereto as Exhibit "G") based upon updated cash flows and other financials provided by Blockfront. Based upon this updated information, CB determined as follows:

> The indicated market value of the fee simple interest subject to existing leases in the subject property, via the income approach, as of March 1, 1997 is: **"AS-IS" ASSUMING CONTINUED USE AS AN OFFICE BUILDING COMPLEX -- FORTY MILLION DOLLARS -- ($40,000,000)**. This value represents a decline of 2.4% from our original valuation which produced a value of $41,000,000. This decrease can be attributed to the increased vacancy rate at the subject property. It should be noted that our concluded opinion of the underlying land value given the potential redevelopment of the site when the market justifies construction *assuming fee simple ownership*, subject remains unchanged at $55,000,000.

*See* Exhibit "G" at p. 5 (emphasis in original).

24.     Eighth, even as late as three weeks ago, LLIW again admitted in its Memorandum of Law dated December 31, 1997 at ¶ 5 that "[u]nder its Plan, LLIW waived its right to distribution as an unsecured creditor." If LLIW were not admittedly undersecured, then why is it waiving its right to distribution as an unsecured creditor?

25.     LLIW now claims that it has a fully secured claim in excess of $84,000,000 which is allegedly increasing on a daily basis because LLIW asserts that it is entitled to post-petition interest. In order for LLIW to be entitled to any post-petition interest, the value of the Real Property would have had to increase from LLIW's admitted value of $55 million on March 25, 1996 to more than $76.5 million on July 2, 1996, the Petition Date.

26.     Section 506(b) of the Bankruptcy Code is clear on its face that the holder of an allowed secured claim is entitled to post-petition "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim rose" only "[t]o the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim . . . ." 11 U.S.C. § 506(b) (emphasis added).

27.     As shown above, LLIW has repeatedly admitted in these proceedings that the value of the Real Property securing its Claim is not greater than the amount of its Claim and, indeed, substantially less.  What the value of the Real Property actually is, and therefore the amount of LLIW's Secured Claim, is something that this Court must determine in an evidentiary hearing.  In any event, LLIW's judicial admissions mandate that LLIW's Secured Claim, if any, must be in an amount substantially less than the amount of its total claim and in no event can it include  as a component any post petition interest.

### Second Claim for Relief — Objection to LLIW Claim

### II.  LLIW'S CLAIM SHOULD BE REDUCED IN ANY EVENT

**LLIW's Proof of Claim Does Not Comport
with the Foreclosure Judgment**

28.     Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in paragraphs 1 through 27 above with the same force and effect as if more fully set forth at length herein.

29.     Whether or not LLIW's Claim is fully or partially secured (which claim has been shown to be only partially secured in Point I above), the full amount of its Claim must be determined by this Court because LLIW has not properly calculated the amount of its Claim.  As such, LLIW's Claim is objectionable for this reason alone.

30.     The Foreclosure Judgment provided that the Debtors were to pay

> $72,968,477.88, the amount due to plaintiff as of October 1, 1995 on the mortgage and note. . . together with interest accruing thereafter on the unpaid principal of $58,532,243.41 through the date of entry of this judgment [i.e., June 3, 1996], and thereafter on said total sum at the statutory rate of 9% per annum until the date of payment or so much thereof as the purchase price of the mortgaged premises will pay of the same.

Foreclosure Judgment, Exhibit "A," at p. 7.

31.    The Debtors' have calculated that (i) the accrued interest on the unpaid principal of $58,532,243.41 from October 1, 1995 to June 3, 1996 equals $2,756,807.70; and (ii) the 9% statutory interest on the total sum of $75,725,285.58 [$72,968,477.88 + $2,756,807.70] from June 3, 1996 through the Petition Date of July 2, 1996 equals $541,487.65.

32.    The Debtors have also reviewed their books and records and have ascertained that prior to the Petition Date, the Receiver paid Heller and Blockfront, LLIW's predecessor-in-interest, a total of approximately $1,584,000 in interest payments.[3]

33.    Accordingly, the Debtors have calculated that the amount owed under the Foreclosure Judgment as of the Petition Date was $74,682,773.23.  This calculation was derived as follows:

---

[3]  The Receiver paid $1,000,000 to Blockfront on May 29, 1996, $292,000 to Heller on February 13, 1996 and $292,000 to Blockfront on February 13, 1996.  Pursuant to 11 U.S.C. § 547, the $1,000,000 payment which was made to Blockfront within 90 days of the Filing Date may be avoidable as a preferential transfer.  This preferential amount of $1,000,000 has *neither* been repaid to the Debtors *nor* has it been credited against the total Claim asserted by LLIW.

Amount due as of 10/1/95
on the mortgage and note     $72,968,477.88

plus accrued interest on
unpaid principal of
$58,532,243.41 from
10/1/95 to 6/3/96     $2,756,807.70

                       $75,725,285.58

plus 9% statutory
interest from
6/3/96 to 7/2/96     $541,487.65

                       $76,266,773.23

minus interest
payments made on
2/13/96 and 5/29/96     $1,584,000.00

                       $74,682,773.23

34.      LLIW's Proof of Claim states that as of the Petition Date $76,951,877.68 was owed under the Foreclosure Judgment. Thus, LLIW's Claim is inflated by at least $2,269,104. LLIW has not filed anything with the Court evidencing how it asserts a claim in excess of $74,682,773.23.

35.      Furthermore, during the course of these Chapter 11 cases, the Receiver has collected rents from the Debtors' property and paid over $375,000 to Blockfront. In its Proof of Claim, LLIW states that "[t]he amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim." Proof of Claim, Exhibit "B," at ¶ 6. The Debtors submit that LLIW has not credited the Debtors with the $375,000 which was paid by the Receiver. The Debtors should be credited for the $375,000 and therefore, LLIW's total Claim should not be greater than $74,307,773.23.

### Third Claim for Relief —
### Recovery of Preferential Transfer

36.     Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in paragraphs 1 through 35 above with the same force and effect as if more fully set forth at length herein.

37.     This complaint for recovery of a preferential transfer is an adversary proceeding within the meaning of Bankrupty Rule 7001(1).

38.     This is a core proceeding in accordance with Bankruptcy Rule 7008.

39.     LLIW is the successor-in-interest to Blockfront. As such, LLIW succeeds in all respects to the rights, privileges, obligations, duties and infirmities of Blockfront as regards Blockfront's relationship with the Debtors.

40.     Within ninety (90) days before the Petition Date, and on or about May 29, 1996, the Debtors, or the Receiver, transferred property of the Debtors' estates, consisting of one million ($1,000,000) dollars in cash to Blockfront.

41.     Said transfer was made on account of an antecedent debt then owing from the Debtors to Blockfront.

42.     At the time of the transfer, the Debtors were insolvent.

43.     The effect of said transfer was to enable Blockfront and LLIW, as its successor-in-interest, to receive more than it would have received had the transfer not been made and Blockfront, and LLIW as its successor-in-interest, had instead received payment on account of its claim to the extent provided by the provisions of the Bankruptcy Code.

44.     As admitted by LLIW, on May 29, 1996, the value of the Plaintiffs' property securing payment of the LLIW Claim was substantially less than the amount of the LLIW Claim.

45.      There was a reduction, to the prejudice of creditors holding unsecured claims, of the amount by which the debt owed to LLIW exceeded the value of the Debtors' property collaterizing such claim.  The decrease in such deficiency of the $1,000,000 payment is recoverable by the Plaintiffs pursuant to 11 U.S.C. §§ 547 and 550.

46.      Accordingly, Plaintiffs seek judgment against LLIW in the amount of $1,000,000 and for an order directing that the LLIW Claim be disallowed unless LLIW has paid to Plaintiffs the sum of $1,000,000 in accordance with 11 U.S.C. § 502(d).

### Fourth Claim for Relief — Subordination (Dominion and Control)

47.      Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in paragraphs 1 through 46 above with the same force and effect as if more fully set forth at length herein.

48.      Plaintiffs seek judgment against LLIW equitably subordinating its Claim to the claims of all other creditors.

49.      LLIW, as the successor-in-interest to Blockfront, acquired the status of a lender to Plaintiffs, as borrower.  As such, LLIW had a duty of fair dealing with Plaintiffs.

50.      In flagrant breach of its duties owed to Plaintiffs, LLIW engaged in a course of conduct where it sought and continues to seek to obtain an unfair and unjust personal advantage at the expense of Plaintiffs and/or their creditors.

51.      LLIW, a mere lender, has assumed the role of owner of the Debtors' property, has acted as such, has exercised unlawful dominion and control over such property, and has mismanaged such property, all to the detriment of Plaintiffs and their other creditors.

52. Prior to the time when LLIW succeeded to the interests of Blockfront, LLIW had adopted a wrongful scheme to act not as a lender owing duties to a borrower, but instead to seize control of the Plaintiffs' bankruptcy case and acquire ownership of the Plaintiffs' property.

53. LLIW advised the Receiver that it would not consent to any new leases or extensions of existing leases at the Plaintiffs' property since LLIW had decided to demolish the existing buildings. Such consents were unreasonably withheld.

54. Upon information and belief, prospective tenants were dissuaded from leasing space at the Debtors' property.

55. Upon information and belief , LLIW has not permitted the Receiver to collect rents from hold-over tenants of the Plaintiffs' at rates provided for in their leases.

56. The above actions damaged the Debtors and diminished the value of their property.

57. Accordingly, the LLIW Claim should be subordinated to the claims of all of the Debtors' other creditors.

### Fifth Claim for Relief — Subordination (Non-Disclosure)

58. Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in paragraphs 1 through 57 above with the same force and effect as if more fully set forth at length herein.

59. To finance its acquisition of the Blockfront interest, LLIW entered into an agreement with Credit Suisse First Boston Mortgage Capital LLC (the "Credit Suisse Agreement").

60. Pursuant to the Credit Suisse Agreement, LLIW was *required* to file a disclosure statement and reorganization plan for the Debtors and to diligently proceed to acquire ownership of the Plaintiffs' property.

61.    The Credit Suisse Agreement further provided funds for LLIW to "buy-out" the interests of existing tenants of the Plaintiffs' property and contemplated demolition of the existing buildings. Credit Suisse also provided LLIW with a standby-commitment of funds for LLIW to utilize to acquire development rights in order to construct a new office building on the site of the Plaintiffs' existing buildings. Credit Suisse was also given the right to provide construction financing for a new office building.

62.    The Credit Suisse Agreement provided for a fifty-fifty (50-50) sharing between Credit Suisse and LLIW of any increase in value of the subject property determined at the maturity of the Credit Suisse loan or upon sale. This provision further evidences LLIW's improper intent to act as owner and to retain (together with Credit Suisse) all appreciation in the Debtors' estate to the detriment of the Debtors and their other creditors.

63.    The Credit Suisse Agreement also provided funds for LLIW to acquire fee ownership of a parcel of real property which is presently leased to the Plaintiffs.

64.    As the proponent of a plan of reorganization, LLIW had a duty to disclose the above facts and all other material facts to the Bankruptcy Court, the Debtors, all creditors and the holders of equity interests. The required disclosure would have included LLIW's scheme to acquire ownership of the property, its financing therefor, its plan to demolish the existing buildings, its sharing arrangement with Credit Suisse, and its plan to operate or cause the Receiver to operate the property in a manner that would facilitate its objective — all in competition with the Debtors.

65.    LLIW made no such disclosure and accordingly failed to provide sufficient disclosure as mandated by the Bankruptcy Code and Bankruptcy Rules.

66.    Upon information and belief, had proper disclosure been made by LLIW, this would have resulted in further inquiry on the part of the Debtors, their creditors, and limited partners, and

could have resulted in additional consideration being afforded to them under LLIW's plan of reorganization.

67. Accordingly, for all of its improper and wrongful conduct, the LLIW Claim should be subordinated to the claims of all of the Debtors' other creditors.

### Sixth Claim for Relief — Subordination (False Proof of Claim)

68. Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in paragraphs 1 through 67 above with the same force and effect as if more fully set forth at length herein.

69. The Proof of Claim Number 56 filed by LLIW seeks post-petition interest when LLIW has consistently admitted it is undersecured.

70. The Proof of Claim filed by LLIW fails to credit the Debtors with the payments recited above.

71. The Proof of Claim filed by LLIW is incorrect and, upon information and belief, was knowingly filed incorrectly.

72. Accordingly, the LLIW Claim should be subordinated to the claims of all of the Debtors' other creditors.

### Seventh Claim for Relief — Subordination (Breach of Duty)

73. Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in paragraphs 1 through 72 above with the same force and effect as if more fully set forth at length herein.

74. LLIW, as the assignee of a claim which originated with Heller, stood in the shoes of Heller, as the Debtors' lender.

16

could have resulted in additional consideration being afforded to them under LLIW's plan of reorganization.

67.     Accordingly, for all of its improper and wrongful conduct, the LLIW Claim should be subordinated to the claims of all of the Debtors' other creditors.

### Sixth Claim for Relief — Subordination (False Proof of Claim)

68.     Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in paragraphs 1 through 67 above with the same force and effect as if more fully set forth at length herein.

69.     The Proof of Claim Number 56 filed by LLIW seeks post-petition interest when LLIW has consistently admitted it is undersecured.

70.     The Proof of Claim filed by LLIW fails to credit the Debtors with the payments recited above.

71.     The Proof of Claim filed by LLIW is incorrect and, upon information and belief, was knowingly filed incorrectly.

72.     Accordingly, the LLIW Claim should be subordinated to the claims of all of the Debtors' other creditors.

### Seventh Claim for Relief — Subordination (Breach of Duty)

73.     Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in paragraphs 1 through 72 above with the same force and effect as if more fully set forth at length .herein.

74.     LLIW, as the assignee of a claim which originated with Heller, stood in the shoes of Heller, as the Debtors' lender.

75.    LLIW's actions, as set forth above, including its scheme to purchase real property leased to the Debtors, which real property is essential to the development of the parcel by the Debtor, was in direct competition with the interests of the Debtors. Such actions impaired the Debtors' ability to maximize the value of their assets for the benefit of the community of interests in the Debtors.

76.    LLIW breached its duty of fair dealing with the Debtors.

77.    LLIW's self-dealing resulted in an unfair and unjust personal advantage for LLIW at the expense of the Debtors and their other creditors.

78.    Accordingly, the LLIW Claim should be subordinated to the claims of all of the Debtors' other creditors.

### Eighth Claim for Relief — Money Damages

79.    Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in paragraphs 1 through 78 above with the same force and effect as if more fully set forth at length herein.

80.    By reason of LLIW's aforesaid conduct in, among other things, not permitting the Receiver to execute new leases, grant extensions of existing leases, and not permitting the Receiver to collect amounts as provided for in tenant leases, Plaintiffs have been damaged.

81.    By reason of LLIW's (i) holding itself out and acting as owner of the Plaintiffs' property, (ii) announcing its plan to demolish the existing buildings, and (iii) not permitting the Receiver to operate the property in the normal and ordinary course, Plaintiffs have been damaged in an amount Plaintiffs estimate to be in the millions of dollars, which amount shall be determined by this Court.

WHEREFORE, Plaintiffs pray for judgment against Defendant, as follows:

A.     On the First Claim, expunging, reducing and/or reclassifying all or a portion of Proof of Claim Number 56 filed by LLIW;

B.     On the Second Claim, expunging, reducing and/or reclassifying all or a portion of Proof of Claim Number 56 filed by LLIW;

C.     On the Third Claim, in the amount of $1,000,000 and declaring that the LLIW Claim be disallowed unless and until LLIW has paid to Plaintiffs the sum of $1,000,000;

D.     On the Fourth Claim, subordinating the LLIW Claim to the claims of all other creditors;

E.     On the Fifth Claim, subordinating the LLIW Claim to the claims of all other creditors;

F.     On the Sixth Claim, subordinating the LLIW Claim to the claims of all other creditors;

G.     On the Seventh Claim, subordinating the LLIW Claim to the claims of all other creditors;

H.     On the Eighth Claim, in an amount to be determined by this Court; and

I.     On all Claims, granting Plaintiffs such other and further relief as may be just and

proper.

Dated: New York, New York
      January _ 1 , 1998

> ANGEL & FRANKEL, P.C.
> Attorneys for Madison Plaza Associates and
> Madison Plaza Land Limited Partnership, Debtors
>
> By:_____
>        Bruce Frankel (BF-9009)
>        A Member of the Firm
> 460 Park Avenue
> New York, New York 10022
> (212) 752-8000

Exhibit A

At an IAS Part 11 of the Supreme
Court of the State of New York,
held in and for the County of New
York, at the Supreme Court
Courthouse located at 60 Centre
Street, New York, New York, on
the 5 day of ~~~~~ 1996.
     June

P R E S E N T :

HON. LEWIS R. FRIEDMAN,
                    Justice.
-----------------------------------------x
                                          :
HELLER FINANCIAL, INC.,                   :
                                          :
                         Plaintiff,       :
                                          :    Index No. 124645/93
            - against -                   :
                                          :
APPLE TREE REALTY ASSOCIATES, MADISON AVENUE:
LAND LIMITED PARTNERSHIP, MADISON PLAZA:       AMENDED JUDGMENT OF
ASSOCIATES, CRC PROPERTIES, INC., 310:         FORECLOSURE AND SALE
MADISON CAPITAL PARTNERS LIMITED:
PARTNERSHIP, LUZERN HOLDINGS, INC., 310:
REALTY PARTNERS, CRC REALTY CAPITAL CORP., :
L & M LARGO CO., INC., EAGLE BROKERAGE, :
INC., THE CITY OF NEW YORK, SEVENTH CITY:
CORP., and CRC REALTY SERVICES, INC. (f/k/a:
CARNEGIE REALTY SERVICES, INC.),          :
                                          :
                         Defendants.      :
                                          :
THE FUJI BANK, LIMITED,                    :
                                          :
                    Additional Defendant  :
                    on Counterclaim.      :
-----------------------------------------x

Upon the summons and verified complaint and notice of
pendency of action, containing all of the particulars required
to be stated therein, both duly filed in the New York County
Clerk's Office on September 29, 1993, and on reading the
affidavit of Carla T. Main, sworn to February 6, 1996, and the
affidavits of service showing that all of the defendants above-

HFNY1.242246.1/3054-001/031896

since said defendants were so served and appeared or defaulted as aforesaid, that defendants Apple Tree Realty Associates, Madison Avenue Land Limited Partnership, Madison Plaza Associates, CRC Properties, Inc., 310 Madison Capital Partners Limited Partnership, Luzern Holdings, Inc., 310 Realty Partners, CRC Realty Capital Corp., CRC Realty Services, Inc. (f/k/a Carnegie Realty Services, Inc.) were duly served with the summons and verified complaint and on November 22, 1993, appeared in the action and served a verified answer and counterclaims, that defendant L & M Largo Co., Inc. was duly served with the summons and verified complaint on October 8, 1993, and on or about October 19, 1993, appeared in the action and served a notice of appearance and waiver, that defendant Eagle Brokerage Inc. was duly served with the summons and verified complaint on October 7, 1993, and has neither answered nor moved with respect to the summons and verified complaint, that defendant The City of New York was duly served with the summons and verified complaint and on August 5, 1994, appeared in the action and served a notice of appearance and stipulation, and that defendant Seventh City Corp. was served with the summons and verified complaint on October 8, 1993, and has neither answered nor moved with respect to the summons and verified complaint, and that defendant on the counterclaim The Fuji Bank, Limited was duly served with the summons and verified complaint and on January 24, 1994, appeared in the action and served an answer; that upon information and belief, none of the defendants is an infant, absentee or person of unsound mind; and

that all the proceedings herein have been regular and in accordance with the rules and practice of this Court;

AND, an Order having been duly made and filed herein on May 2, 1995, granting summary judgment in favor of plaintiff and against defendants Apple Tree Realty Associates, Madison Avenue Land Limited Partnership, Madison Plaza Associates, CRC Properties, Inc., 310 Madison Capital Partners Limited Partnership, Luzern Holdings, Inc., 310 Realty Partners, CRC Realty Capital Corp., CRC Realty Services, Inc. (f/k/a Carnegie Realty Services, Inc.), and appointing Arthur Gerwin as referee, to ascertain and compute the amount due, and the amount which hereafter may become due, to plaintiff upon the note and mortgage set forth in the verified complaint for principal, interest and other charges, including amounts advanced by the plaintiff to protect the collateral afforded by the note and mortgage being foreclosed upon, and the amount that is or may be due to such of the defendants as are prior encumbrancers of the mortgaged premises, and to examine and report whether the mortgaged premises should be sold as one parcel, and the report of said referee having been duly filed in the New York County Clerk's Office on September 29, 1993, by which it appears that there is due to the plaintiff on the note and mortgage, up to the date of October 1, 1995, the date fixed in said report, the sum of $72,968,477.88, with interest on the unpaid principal from October 2, 1995 to the date of judgment, by which report said Referee has reported that the mortgaged premises, located at 300 Madison Avenue, 310 Madison Avenue, 9 East 41st Street,

15 East 41st Street, New York, New York, should be sold in one parcel pursuant to the note and mortgage; and

Upon reading and filing plaintiff's notice of motion dated June 1, 1994, the affidavit of John W. Penrod, III, sworn to on June 1, 1994, and the exhibits thereto, the affidavit of John C. Petrovski, sworn to on May 31, 1994, and the exhibits thereto, the affirmation of Joanna Shally, dated July 15, 1994, and the exhibits thereto, the affirmation of Michael D. Gargano, dated May 31, 1994, with proof of service, and the affidavit in opposition to the motion of Edward M. Strasser, sworn to on June 29, 1995, and upon the report of Referee Arthur Gerwin, Esq., dated December 5, 1995;

NOW, on motion of HERRICK, FEINSTEIN LLP, attorneys for plaintiff, it is hereby

ORDERED, that plaintiff's motion is granted and the caption is amended as reflected above; and it is further

ORDERED, that the report of Arthur Gerwin, Esq., Referee, is confirmed; and it is further

ORDERED, ADJUDGED AND DECREED, that plaintiff is entitled to have judgment herein for the sum of $72,968,477.88, together with interest on the unpaid principal amount from October 2, 1995 to the date of this judgment, and it is further

ORDERED, ADJUDGED AND DECREED that the mortgaged premises described in the verified complaint and as hereinafter set forth, be sold in one parcel, pursuant to the note and mortgage, at public auction in the Rotunda of the Supreme Court Courthouse, 60 Centre Street, New York, New York, by and under

the direction of Arthur Gerwin, Esq., who is hereby appointed Referee for that purpose; that the referee give public notice of the time and place of the sale according to law and the practice of this Court by publishing the notice of sale in the New York Law Journal, and that plaintiff or any other parties to this action may become the purchaser or purchasers at such sale; that in case plaintiff shall become the purchaser at the sale it shall not be required to make any deposit thereon; that the referee execute to the purchaser or purchasers on such sale bills of sale for all personalty that may be contained in or about the mortgaged premises and a deed of the mortgaged premises sold; except that the purchaser shall take such title subject to (i) any state of facts an accurate survey may show and a physical inspection would disclose; (ii) zoning regulations and ordinances and any violations thereof, of the County of New York and the City of New York; (iii) all orders or requirements or any violations of the same issued by a governmental body having jurisdiction against or affecting the mortgaged premises; (iv) all statutes, ordinances and regulations (including all building restrictions and regulations) of any kind or nature affecting the mortgaged premises and any violations of same; (v) all environmental statutes, regulations and ordinances of any kind or nature affecting the mortgaged premises and any violations thereof; (vi) rights of tenants and/or occupants in possession, if any; (vii) easements, covenants, agreements, liens, encumbrances, reservations and restrictions of record or other matter of

mortgaged premises; (iv) all statutes, ordinances and regulations (including all building restrictions and regulations) of any kind or nature affecting the mortgaged premises and any violations of same; (v) all environmental statutes, regulations and ordinances of any kind or nature affecting the mortgaged premises and any violations thereof; (vi) rights of tenants and/or occupants in possession, if any; (vii) easements, covenants, agreements, liens, encumbrances, reservations and restrictions of record or other matter of record existing prior to the recording of the mortgage and/or the filing of the notice of pendency of this action, if any, insofar as the same may be in force and effect; and (vii) charges for maintenance of street vaults, if any; that the referee on receiving the proceeds of such sale forthwith pay therefrom in accordance with their priority according to law, the taxes assessments or water rates which are or may become liens on the mortgaged premises at the time of sale with such interest or penalties which may have lawfully accrued thereon to the date of payment; that said referee then deposit the balance of the proceeds of sale in his own name as referee in _____ _____ Bank, in an interest bearing account; and that said referee shall thereafter make the following payments therefrom:

FIRST: He shall pay a sum not to exceed $200, the amount allowed by Section 8003(b) of the CPLR, to the referee as his fee herein, unless the property sells for ten thousand dollars or more, in which event the referee may receive such additional compensation as

assessments, water rates and sewer rents, together with such interest or penalties as may lawfully have accrued thereon to date of payment, together with any and all sums which may be necessary to redeem the mortgaged premises so sold from any and all sales for unpaid real estate taxes, assessments, water rates and sewer rents.

FOURTH: He shall pay to plaintiff the amount of $72,968,477.88, the amount due to plaintiff as of October 1, 1995 on the mortgage and note, as aforesaid, together with interest accruing thereafter on the unpaid principal of $58,532,243.41 through the date of entry of this judgment, and thereafter on said total sum at the statutory rate of 9% per annum until the date of payment or so much thereof as the purchase price of the mortgaged premises will pay of the same, and also any amounts paid by the plaintiff for any taxes, water or sewer charges, and insurance or for the protection or preservation of the property since October 2, 1995, and any payments necessary to satisfy realty taxes, water and other charges and assessments, and interest or penalties thereon, and expenses reimbursable under the mortgage, costs and disbursements not previously included in the above computation.

FIFTH: He shall pay to the plaintiff, or its attorneys the sum of $_____ which is hereby awarded to it for the costs and disbursements of this action, to be taxed by the Clerk of the Court and inserted herein, with legal interest from the date hereof, together with an additional allowance of $300.00 hereby awarded to the plaintiff in addition to costs and disbursements, with legal interest thereon from the date hereof.

and it is further

ORDERED, ADJUDGED AND DECREED that in case plaintiff or its nominee or assignee is the purchaser of the mortgaged premises at the sale, or in the event that the rights of the purchaser at the sale and the terms of sale under this judgment

shall be assigned to and be acquired by plaintiff, and a valid assignment thereof is filed with the referee, the referee shall not require plaintiff or its nominee or assignee to pay in cash the entire amount bid at such sale, but shall execute and deliver to plaintiff or its nominee or assignee a deed of the mortgaged premises sold upon the payment to said referee of the amounts specified above in items marked "FIRST", "SECOND" and "THIRD" and the amount of the aforesaid taxes, assessments and water rates and interest or penalties thereon, or in lieu of the payment of the last mentioned amounts upon filing with the referee receipts of the proper municipal authorities, showing the payment thereof; that the balance of the amount bid after deduction therefrom of the aforesaid amounts paid by plaintiff shall be allowed to plaintiff and applied by the referee upon the amounts due to plaintiff as specified above in items marked "FOURTH" and "FIFTH"; that if after so applying the balance of the amount bid there shall be a surplus over and above amounts due to plaintiff, plaintiff shall pay to the referee, upon delivery of the referee's deed, the amount of such surplus; that the referee on receiving the several amounts from plaintiff shall forthwith pay therefrom first, the taxes, assessments, water rates and interest or penalties thereon, unless the same shall have already been paid, and shall pay the surplus moneys into Court; and it is further

ORDERED, ADJUDGED AND DECREED that the referee shall take the receipts of plaintiff or its attorneys for the amounts

paid as hereinbefore directed and file it with his or her report of sale; that the referee shall pay into Court the surplus moneys, if any, within five days after the same shall be received and be ascertainable to the credit of this action, to be withdrawn only on the order of the Court signed by a Justice of this Court; that the referee shall make a report of such sale under oath and file it with the Clerk of New York County, with all convenient speed; and it is further

ORDERED, ADJUDGED AND DECREED that the purchaser or purchasers at said sale be let into possession on production of the referee's deed; and its further

ORDERED, ADJUDGED AND DECREED that each and all of the defendants in this action and all persons claiming under them or any or either of them after the filing of the notice of the pendency of this action, be and they hereby are forever barred and foreclosed of all right, claim, lien, title, interest and equity of redemption in said mortgaged premises and each and every part and parcel thereof, including the right to refunds resulting from tax certiorari proceedings, except that nothing herein shall bar the right, if any, of the United States of America to redeem, as provided in Title 28 of the United States Code, Section 2410(c), and except that any surplus money from the sale of the mortgaged premises that is paid into Court, as aforesaid, shall be promptly remitted to the debtor to the extent consistent with law; and it is further

ORDERED ADJUDGED AND DECREED, that nothing in this judgment shall bar plaintiff from pursuing, and all relief under this judgment shall be mutually exclusive from, the remedies at law available to plaintiff against defendants Apple Tree Realty Associates, Madison Plaza Associates, and the defendant general partners known as CRC Properties, Inc., 310 Madison Capital Partners Limited Partnership, Luzern Holdings, Inc., 310 Realty Partners, CRC Realty Capital Corp., for any misappropriation of funds under paragraph 26.1 of the Mortgage, specifically, to the extent of all gross income from the Mortgaged Property after the occurrence of an event of default under the Mortgage, and/or after the Mortgagee accelerated the indebtedness, which was not applied in payment of the Mortgaged Property in the ordinary course of business; and it is further

ORDERED, ADJUDGED AND DECREED that the purchaser of the mortgaged premises at the sale shall take title to the mortgaged premises notwithstanding that a tenant, occupant or licensee may wrongfully remain in possession of a portion or portions of the mortgaged premises, it being the responsibility of said purchaser to take whatever actions may be required to recover possession of the mortgaged premises from such tenant, occupant or licensee.

mortgaged premises notwithstanding that a tenant, occupant or licensee may wrongfully remain in possession of a portion or portions of the mortgaged premises, it being the responsibility of said purchaser to take whatever actions may be required to recover possession of the mortgaged premises from such tenant, occupant or licensee; and it is further

ORDERED, ADJUDGED AND DECREED that the prior Judgment of Foreclosure and Sale dated February 21, 1996 and entered in the above-captioned action and duly filed with the Clerk of the Court of New York County on March 6, 1996 is hereby vacated in its entirety and substituted in whole by the within amended judgment of foreclosure and sale.

A description of the mortgaged premises hereinbefore mentioned is set forth in the attached Schedule A.

E N T E R:

_____
J.S.C.

FILED

JUN 3 1996

COUNTY CLERK'S OFFICE
NEW YORK

Exhibit B

ORIGINAL

| United States Bankruptcy Court | PROOF OF CLAIM |
|---|---|
| __Southern__ District of __New York__ | |
| In re (Name of Debtor) Madison Plaza Associates | Case Number 96 B 43547 (CB) |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor<br>*(The person or other entity to whom the debtor owes money or property)*<br>LLIW, LLC<br><br>Name and Address Where Notices Should be Sent<br>Robert E. Grossman, Esq.<br>Mark A. Frankel, Esq.<br>Backenroth & Grossman, LLP<br>885 Second Avenue<br>New York, New York 10017<br>Telephone No. (212) 593-1100 | ☐ Check box if you are aware that any-<br>one else has filed a proof of claim<br>relating to your claim. Attach copy of<br>statement giving particulars.<br><br>☒ Check box if you have never received<br>any notices from the bankruptcy court<br>in this case.<br><br>☐ Check box if the address differs from<br>the address on the envelope sent to<br>you by the court. | # 56<br>(5)<br><br>THIS SPACE IS FOR<br>COURT USE ONLY |

ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR:　　Check here if this claim ☐ replaces　a previously filed claim, dated:_____
☐ amends

| 1. BASIS FOR CLAIM<br>☐ Goods sold<br>☐ Services performed<br>☒ Money loaned<br>☐ Personal injury/wrongful death<br>☐ Taxes<br>☐ Other (Describe briefly) | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)<br>☐ Wages, salaries, and compensation (Fill out below)<br>Your social security number_____<br>Unpaid compensation for services performed<br>from_____　　　to_____<br>　　(date)　　　　　　(date) |
|---|---|

| 2. DATE DEBT WAS INCURRED | 3. IF COURT JUDGMENT, DATE OBTAINED:<br>June 3, 1996 |
|---|---|

4. CLASSIFICATION OF CLAIM. Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured nonpriority.
(2) Unsecured Priority. (3) Secured. It is possible for part of a claim to be in one category and part in another.
CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM AT TIME CASE FILED.

76,951,877.68 as of July 2, 1996

| ☒ SECURED CLAIM $ plus interest as provided for<br>Attach evidence of perfection of security interest. in court judgment<br>Brief Description of Collateral:<br>☒ Real Estate ☐ Motor Vehicle ☐ Other (Describe briefly)<br><br>Amount of arrearage and other charges at time case filed included in<br>secured claim above, if any $ _____<br><br>☐ UNSECURED NONPRIORITY CLAIM $ _____<br>A claim is unsecured if there is no collateral or lien on property of the<br>debtor securing the claim or to the extent that the value of such prop-<br>erty is less than the amount of the claim.<br><br>☐ UNSECURED PRIORITY CLAIM $ _____<br>Specify the priority of the claim. | ☐ Wages, salaries, or commissions (up to $4000),* earned not more than 90<br>days before filing of the bankruptcy petition or cessation of the debtor's busi-<br>ness, whichever is earlier—11 U.S.C. § 507(a)(3)<br><br>☐ Contributions to an employee benefit plan—11 U.S.C. § 507(a)(4)<br><br>☐ Up to $1,800* of deposits toward purchase, lease, or rental of property or<br>services for personal, family, or household use—11 U.S.C. § 507(a)(6)<br><br>☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child—<br>11 U.S.C. § 507(a)(7)<br><br>☐ Taxes or penalties of governmental units—11 U.S.C. § 507(a)(8)<br><br>☐ Other—Specify applicable paragraph of 11 U.S.C. § 507(a)____<br>*Amounts are subject to adjustment on 4/11/98 and every 3 years thereafter<br>with respect to cases commenced on or after the date of adjustment. |
|---|---|

| 5. TOTAL AMOUNT OF<br>CLAIM AT THE TIME<br>CASE FILED:<br><br>☐ Check this box if claim includes charges in addition to the principal amount of the claim. Attach itemized statement of all additional charges. | 76,951,877.68 as of<br>$ _____ $ July 2, 1996 plus $ _____<br>(Unsecured)　(Secured)　(Priority)<br>interest as provided for in court judgment | $ 76,951,877.68 as of<br>July 2, 1996 plus<br>interest as<br>provided for in court<br>judgment<br>THIS SPACE IS FOR<br>COURT USE ONLY |
|---|---|---|

6. CREDITS AND SETOFFS: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. In filing this claim, claimant has deducted all amounts that claimant owes to debtor.

7. SUPPORTING DOCUMENTS: *Attach copies of supporting documents*, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. If the documents are not available, explain. If the documents are voluminous, attach a summary.

8. TIME-STAMPED COPY: To receive an acknowledgement of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

| Date<br><br>9/22/97 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any)<br>By: LLIW, Inc.; Managing Member<br>By: Kevin Heinis, Vice President |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Exhibit C

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------x

In re:                                    Chapter 11

MADISON PLAZA ASSOCIATES and MADISON      Case Nos. 96 B 43547 (CB)
AVENUE LAND LIMITED PARTNERSHIP,               and 96 B 43548 (CB)

                    Debtors.

-------------------------------------x

# DISCLOSURE STATEMENT

PLAN OF REORGANIZATION

for

MADISON PLAZA ASSOCIATES

and

MADISON AVENUE LAND LIMITED PARTNERSHIP

PROPOSED BY LLIW LLC

August 4, 1997

BACKENROTH & GROSSMAN, LLP
885 Second Avenue
New York, New York 10017
(212) ~~592-1400~~   593-1100
Mark A. Frankel, Esq. (MAF-8417)
LLIW LLC

11.   The Property is encumbered by the LLIW Mortgage. The total outstanding amount thereunder is in excess of $81 million.

12.   In 1993, LLIW's predecessor in interest filed a foreclosure complaint against the Debtors based upon certain defaults under the LLIW Note and Mortgage.  Thereafter, Lawrence Rivkin was appointed as receiver, and he has continued to operate the Property throughout these proceedings.

13.   Pursuant to an appraisal by C.B. Commercial Real Estate Group, the Property has a value of approximately $55 million as of March, 1997.  Accordingly, it is likely that if LLIW were to complete is foreclosure action, there would be no distribution for Unsecured Creditors in this case.

14.   The Debtors have not filed a plan in this case.

15.   Essentially, LLIW proposes to conduct an auction of the Property in the Bankruptcy Court, and in connection therewith, to create a $500,000 Implementation Fund to pay Unsecured Creditors a distribution on their Claims.

1129(a)(9)(c), in full settlement, release and discharge of such Allowed Priority Tax Claim, Cash from the Distribution Fund equal to the amount of such Allowed Priority Tax Claim. Allowed Class Three Priority Tax Claims are not impaired under the Plan, and are deemed to have accepted the Plan. The Debtor's Schedules reflect a $32.00 Class Two Claim.

20. **Class Three Claims - LLIW Secured Claim.** The treatment of the Allowed Class Three LLIW Secured Claim shall be as follows: (A) LLIW shall receive on the Effective Date all Cash (less the Cash necessary to fund the Distribution Fund) of the Receivables and the Tax Proceeds and (b) title to the Real Property and the Related Property shall be transferred to the Transferee on the Consummation Date. The Allowed Class Three Claim is impaired under the Plan. LLIW's Class Three Claim is in excess of $81,000, of which at least $55 million is secured.

21. **Class Four Claims - Unsecured Claims.** Each holder of an Allowed Class Four Claim shall receive on the Effective Date (or as soon as practicable thereafter), or on such later date as the Claim is allowed, its *pro rata* distribution from the Distribution Fund, after the payment of Administration Claims, Class One Claims, and Class Two Claims from the Distribution Fund. The Claims in Class Four are impaired under the Plan, and each holder of an Allowed Class Four Claim is entitled to vote to accept or reject the Plan. Since the value of the Property is substantially less than LLIW's Claim, Class Four Claims include all General Unsecured Creditors, as well as all secured Claims that are

7



subordinate to LLIW's Claim. According to the Debtor's schedules, therefore, Class Four Claims total approximately $220,000,000, almost all of which is held by "insiders," as that term is defined by the Bankruptcy Code. In addition, LLIW has an Unsecured Claim of up to approximately $26 million, because the value of the Property is less than LLIW's Claim. LLIW waives its right to distribution as a Class Four Creditor, but not its right to vote as a Class Four Creditor.

22. **Class Five - Partnership Interests.** The holders of an Allowed Class Five Interest shall receive no distribution under this Plan. All holders of Allowed Class Five Interests shall retain their respective interests in the Debtors. Class Five Interests are impaired under the Plan, and each holder of a Class Five Interest is entitled to vote to Accept or Reject the Plan.

## MEANS FOR IMPLEMENTATION OF PLAN

23. <u>**Transfer of the Property to Bankruptcy Code or its Designee.**</u>

a. <u>**Delivery of the Property.**</u> (a) Upon 7 days' written notice from LLIW, the Debtors shall execute and deliver to Transferee a Bargain and Sale Deed without covenants (the "Deed"), in proper statutory form for recording, and containing the covenant required by Lien Law Section 13(5), conveying to Transferee fee title interest in and to the Real Property, free and clear of all liens, encumbrances, claims or adverse interests whatsoever, except

8

Exhibit D

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

In re:                              Chapter 11

MADISON PLAZA ASSOCIATES and MADISON    Case Nos. 96 B 43547 (CB)
AVENUE LAND LIMITED PARTNERSHIP,              and 96 B 43548 (CB)

                    Debtors.

------------------------------------x


# AMENDED DISCLOSURE STATEMENT

## for

## MADISON PLAZA ASSOCIATES

### and

## MADISON AVENUE LAND LIMITED PARTNERSHIP

### PROPOSED BY LLIW LLC


September __, 1997




BACKENROTH & GROSSMAN, LLP
885 Second Avenue
New York, New York 10017
(212) 593-1100
Mark A. Frankel, Esq. (MAF-8417)
LLIW LLC

have accepted the Plaza Plan.  The Debtors' Schedules reflect a $32.00 Plaza Class Two Claim.

24.  **Plaza Class Three Claims - LLIW Secured Claim.**  The treatment of the Plaza Allowed Plaza Class Three LLIW Secured Claim shall be as follows:  LLIW shall receive the proceeds of the sale of the title to the Plaza Property.  The Allowed Plaza Class Three Claim is impaired under the Plaza Plan, and the Plaza Class Three Creditor is entitled to vote to accept or reject the Plaza Plan.

25.  **Plaza Class Four Claims - Unsecured Claims.**  Each holder of an Allowed Plaza Class Four Claim shall receive on the Effective Date (or as soon as practicable thereafter), or on such later date as the Claim is allowed, its *pro rata* distribution from the Plaza Distribution Fund, after the payment of Plaza Administration Claims, Plaza Class One Claims, and Plaza Class Two Claims from the Plaza Distribution Fund.  Plaza Class Four Claims are impaired under the Plaza Plan, and each holder of an Allowed Plaza Class Four Claim is entitled to vote to accept or reject the Plaza Plan.  Since the value of the Plaza Property is substantially less than LLIW's Claim, Plaza Class Four Claims include all Plaza General Unsecured Creditors, as well as all secured Claims that are subordinate to LLIW's Claim.  According to the Debtors' schedules, therefore, Plaza Class Four Claims total in excess of $220,000,000, almost all of which is held by "insiders," as that term is defined by the Bankruptcy Code.  Approximately $3 million of Plaza Class Four Claims is held by non-insiders, according to the Debtors' schedules.  In addition, LLIW has an Unsecured Claim equal to the

difference between the value of the Plaza Property and LLIW's Claim. LLIW waives its right to distribution as a Plaza Class Four Creditor, but not its right to vote as a Plaza Class Four Creditor.

26. **Plaza Class Five - Partnership Interests.** The holders of an Allowed Plaza Class Five Interest shall receive no distribution under this Plaza Plan. All holders of Plaza Allowed Plaza Class Five Interests shall retain their respective interests in the Plaza Debtor. Plaza Class Five Interests are impaired under the Plaza Plan, because the Plaza Plan alters Plaza's assets and liabilities, and each holder of a Plaza Class Five Interest is entitled to vote to Accept or Reject the Plaza Plan.

## MEANS FOR IMPLEMENTATION OF PLAZA PLAN

27. **Sale of the Plaza Property.** The Plaza Property shall be sold "as is" at an auction sale to be held at the Confirmation Hearing pursuant to 11 U.S.C. §363. The sale of the Plaza Property shall be advertised at least twice in a newspaper of general circulation, at least two weeks before the auction date. The terms of the auction shall provide, _inter alia_, that bidding shall be limited to all cash offers, provided however, that LLIW shall have the right to bid the entire amount of its lien against the Plaza Property pursuant to Section 363(k) of the Bankruptcy Code. The highest bidder shall be the purchaser (the "Transferee") of the Plaza Property, free and clear of all liens, claims and encumbrances, with the Allowed Secured Claim of LLIW to attach to the gross proceeds of sale. The Transferee shall be required,



Priority Non-Tax Claim, Cash from the Land Distribution Fund equal to the amount of such Allowed Land Priority Non-Tax Claim. Allowed Land Class One Priority Non-Tax Claims are not impaired under the Land Plan, and are deemed to have accepted the Land Plan. The Debtors' Schedules reflect no Land Class One Claims.

41. **Land Class Two Claims - Allowed Land Priority Tax Claims.** Each holder of an Allowed Land Class Two Priority Tax Claim shall receive on the Effective Date (or as soon thereafter as practicable), or on such later date as such Claim is allowed, in full settlement, release and discharge of such Allowed Land Priority Tax Claim, Cash from the Land Distribution Fund equal to the amount of such Allowed Land Priority Tax Claim. Allowed Land Class Two Priority Tax Claims are not impaired under the Land Plan, and are deemed to have accepted the Land Plan. The Debtors' Schedules reflect no Land Class Two Claims.

42. **Land Class Three Claims - LLIW Secured Claim.** The treatment of the Allowed Land Class Three LLIW Secured Claim shall be as follows: LLIW shall receive on the Effective Date the proceeds of the sale of the title to the Land Property. The Allowed Land Class Three Claim is impaired under the Land Plan, and the Land Class Three Creditor is entitled to vote to accept or reject the Land Plan.

43. **Land Class Four Claims - Unsecured Claims.** Each holder of an Allowed Land Class Four Claim shall receive on the Effective Date (or as soon as practicable thereafter), or on such

18

later date as the Claim is allowed, its *pro rata* distribution from the Land Distribution Fund, after the payment of Land Administration Claims, Land Class One Claims, and Land Class Two Claims and Land Class Three Claims from the Land Distribution Fund. The Claims in Land Class Four are impaired under the Land Plan, and each holder of an Allowed Land Class Four Claim is entitled to vote to accept or reject the Land Plan. Since the value of the Land Property is substantially less than LLIW's Claim, Land Class Four Claims include all Land General Unsecured Creditors, as well as all Land Secured Claims that are subordinate to LLIW's Claim. According to the Debtors' schedules, therefore, Land Class Four Claims total approximately $5,030,352 of Land General Unsecured Claims, all of which is held by "insiders," as that term is defined by the Bankruptcy Code, plus up to $258,000,000 of insider Unsecured deficiency Claims. In addition, LLIW has an Unsecured Claim equal to the difference between the value of the Land Property and LLIW's Claim. LLIW waives its right to distribution as a Land Class Four Creditor, but not its right to vote as a Land Class Four Creditor.

44. **Land Class Five - Partnership Interests.** The holders of an Allowed Land Class Five Interest shall receive no distribution under this Land Plan. All holders of Allowed Land Class Five Interests shall retain their respective interests in the Land Debtor. Land Class Five Interests are impaired under the Land Plan because the Plan alters Land's assets and liabilities, and each holder of a Land Class Nine Interest is entitled to vote to Accept or Reject the Land Plan.

19

Exhibit E

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------x

In re:                                              Chapter 11

MADISON PLAZA ASSOCIATES and MADISON                Case Nos. 96 B 43547 (CB)
AVENUE LAND LIMITED PARTNERSHIP,                          and 96 B 43548 (CB)

                          Debtors.

--------------------------------------x


### JOINT AMENDED DISCLOSURE STATEMENT

for

### MADISON PLAZA ASSOCIATES

and

### MADISON AVENUE LAND LIMITED PARTNERSHIP

### PROPOSED BY LLIW LLC


October
~~September~~ _10_, 1997

BACKENROTH & GROSSMAN, LLP
885 Second Avenue
New York, New York 10017
(212) 593-1100
Mark A. Frankel, Esq. (MAF-8417)
LLIW LLC

the Plaza Plan, and the Plaza Class Three Creditor is entitled to vote to accept or reject the Plaza Plan.

29. **Plaza Class Four Claims - Unsecured Claims.** Each holder of an Allowed Plaza Class Four Claim shall receive on the Effective Date (or as soon as practicable thereafter), or on such later date as the Claim is allowed, its *pro rata* distribution from the Plaza Distribution Fund, after the payment of Plaza Administration Claims, Plaza Class One Claims, and Plaza Class Two Claims from the Plaza Distribution Fund. Plaza Class Four Claims are impaired under the Plaza Plan, and each holder of an Allowed Plaza Class Four Claim is entitled to vote to accept or reject the Plaza Plan. Since the value of the Plaza Property is substantially less than LLIW's Claim, Plaza Class Four Claims include all Plaza General Unsecured Creditors, as well as all secured Claims that are subordinate to LLIW's Claim that have recourse against the Debtor. According to the Debtors' schedules, therefore, Plaza Class Four Claims may total in excess of $164,000,000 for insider deficiency claims alone, if such claims have recourse against the Debtor. There are approximately $40 million of insider general unsecured claims listed on the Debtor's schedules, and $3 million of Plaza Class Four Claims is held by non-insiders, according to the Debtors' schedules.

30. **Plaza Class Five - Partnership Interests.** The holders of an Allowed Plaza Class Five Interest shall receive no distribution under this Plaza Plan. All holders of Plaza Allowed Plaza Class Five Interests shall retain their respective interests

disbursements for Professionals in Southern District of New York Bankruptcy Cases dated June 30, 1991, as amended, the Bankruptcy Code and the Bankruptcy Rules, or shall be deemed to have waived any right to compensation or reimbursement from Plaza's Estate. Objections, if any, to each such application must be filed within three days of the date fixed by the Bankruptcy Court to consider such application.

## FINANCIAL ANALYSIS AND LIQUIDATION ANALYSIS

41.  Financial projections are not included herein because the Plaza Plan does not provide for payments over time. Annexed hereto as Exhibit B is a balance sheet and liquidation analysis based upon the Debtors' schedules. Were the Plaza Debtor to be liquidated, it is likely that only LLIW would receive a distribution from the Plaza Debtor.

## LLIW'S PLAN OF REORGANIZATION FOR MADISON AVENUE LAND LIMITED PARTNERSHIP

## DESIGNATION OF CLAIMS AND INTERESTS

42.  The following Classes of Claims and Interests are designated pursuant to and in accordance with Section 1122 of the Bankruptcy Code.

a.  Land Class One Claims shall consist of the Allowed Land Priority Non-Tax Claims against the Land Debtor.

17

the amount of such Allowed Land Priority Tax Claim. Allowed Land Class Two Priority Tax Claims are not impaired under the Land Plan, and are deemed to have accepted the Land Plan. The Debtors' Schedules reflect no Land Class Two Claims.

46. **Land Class Three Claims - LLIW Secured Claim.** The treatment of the Allowed Land Class Three LLIW Secured Claim shall be as follows: LLIW or its designee shall receive on the Effective Date the proceeds of the sale of the title to the Land Property, or title to the Land Property. In the case of a winning credit bid by LLIW or its designee, LLIW or its designee shall receive title to the Land Property. The Allowed Land Class Three Claim is impaired under the Land Plan, and the Land Class Three Creditor is entitled to vote to accept or reject the Land Plan.

47. **Land Class Four Claims - Unsecured Claims.** Each holder of an Allowed Land Class Four Claim shall receive on the Effective Date (or as soon as practicable thereafter), or on such later date as the Claim is allowed, its *pro rata* distribution from the Land Distribution Fund, after the payment of Land Administration Claims, Land Class One Claims, and Land Class Two Claims and Land Class Three Claims from the Land Distribution Fund. The Claims in Land Class Four are impaired under the Land Plan, and each holder of an Allowed Land Class Four Claim is entitled to vote to accept or reject the Land Plan. Since the value of the Land Property is substantially less than LLIW's Claim, Land Class Four Claims include all Land General Unsecured Creditors, as well as all secured Claims that are subordinate to LLIW's Claim that have

20

recourse against the Debtor. According to the Debtors' schedules, Land Class 4 Claims total approximately $5,030,352 of Land General Unsecured Claims, all of which is held by "insiders," as that term is defined by the Bankruptcy Code, plus up to $258,000,000 of insider Unsecured deficiency Claims which may have recourse against the Debtor.

48. **Land Class Five - Partnership Interests.** The holders of an Allowed Land Class Five Interest shall receive no distribution under this Land Plan. All holders of Allowed Land Class Five Interests shall retain their respective interests in the Land Debtor. Land Class Five Interests are impaired under the Land Plan because the Plan alters Land's assets and liabilities, and each holder of a Land Class Nine Interest is entitled to vote to Accept or Reject the Land Plan.

## MEANS FOR IMPLEMENTATION OF LAND PLAN

49. **Sale of the Land Property.** The Land Property shall be sold "as is" at an auction sale to be held at the Confirmation Hearing pursuant to 11 U.S.C. §363. The sale of the Land Property shall be advertised at least twice in a newspaper of general circulation, at least three weeks before the auction date. The terms of the auction shall provide, _inter alia_, that (i) bidding shall be limited to all cash offers, provided however, that LLIW shall have the right to bid the entire amount of its lien against the Land Property pursuant to Section 363(k) of the Bankruptcy Code. As set forth above, the Debtors believe that the amount of

21

58. **Professional Fees and Expenses.** Each Person retained or requesting compensation or reimbursement in Chapter 11 Case, pursuant to Sections 327, 328, 330, 331, 503(b), or 543 of the Code (including any Custodian for the Property) is required as of _____, 1997, to file with the Clerk of the Bankruptcy Court (with a courtesy copy to the Chambers of Honorable Cornelius H. Blackshear) and serve upon counsel for LLIW an application for allowance of final compensation and reimbursement of expenses in the Chapter 11 case in accordance with the requirements and provisions of the Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases dated June 30, 1991, as amended, the Bankruptcy Code and the Bankruptcy Rules, or shall be deemed to have waived any right to compensation or reimbursement from Land's Estate. Objections, if any, to each such application must be filed within three days of the date fixed by the Bankruptcy Court to consider such application.

## FINANCIAL ANALYSIS AND LIQUIDATION ANALYSIS

59. Financial projections are not included herein because the Land Plan does not provide for payments over time. Annexed hereto as Exhibit B is a balance sheet and liquidation analysis based upon the Land Debtors' schedules. Were the Land Debtor to be liquidated, it is likely that only LLIW would receive a distribution from the Land Debtor.

Exhibit F

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x

In re:

MADISON PLAZA ASSOCIATES and MADISON
AVENUE LAND LIMITED PARTNERSHIP,

                              Debtors.

----------------------------------------x

Chapter 11

Case Nos. 96 B 43547 (CB)
       and 96 B 43548 (CB)


## JOINT AMENDED PLAN OF REORGANIZATION

### for

### MADISON PLAZA ASSOCIATES

### and

### MADISON AVENUE LAND LIMITED PARTNERSHIP

### PROPOSED BY LLIW L.L.C.

September 10, 1997

BACKENROTH & GROSSMAN, LLP
885 Second Avenue
New York, New York 10017
(212) 593-1100
Mark A. Frankel, Esq. (MAF-8417)
LLIW L.L.C.

Tax Claims are not impaired under the Plaza Plan, and are deemed to have accepted the Plaza Plan. The Debtors' Schedules reflect a $32.00 Plaza Class Two Claim.

3.4 **Plaza Class Three Claims - LLIW Secured Claim.** The treatment of the Plaza Allowed Plaza Class Three LLIW Secured Claim shall be as follows: LLIW or its designee shall receive the proceeds of the sale of the title to the Plaza Property, or title to such property. In the case of a winning credit bid by LLIW or its designee, LLIW or its designee shall receive title to the Plaza Property. The Allowed Plaza Class Three Claim is impaired under the Plaza Plan, and the Plaza Class Three Creditor is entitled to vote to accept or reject the Plaza Plan.

3.5 **Plaza Class Four Claims - Unsecured Claims.** Each holder of an Allowed Plaza Class Four Claim shall receive on the Effective Date (or as soon as practicable thereafter), or on such later date as the Claim is allowed, its *pro rata* distribution from the Plaza Distribution Fund, after the payment of Plaza Administration Claims, Plaza Class One Claims, and Plaza Class Two Claims from the Plaza Distribution Fund. Plaza Class Four Claims are impaired under the Plaza Plan, and each holder of an Allowed Plaza Class Four Claim is entitled to vote to accept or reject the Plaza Plan.

3.6 **Plaza Class Five - Partnership Interests.** The holders of an Allowed Plaza Class Five Interest shall receive no distribution under this Plaza Plan. All holders of Plaza Allowed

**6.3  Land Class Two Claims - Allowed Land Priority Tax Claims.**
Each holder of an Allowed Land Class Two Priority Tax Claim shall
receive on the Effective Date (or as soon thereafter as
practicable), or on such later date as such Claim is allowed, in
full settlement, release and discharge of such Allowed Land
Priority Tax Claim, Cash from the Land Distribution Fund equal to
the amount of such Allowed Land Priority Tax Claim. Allowed Land
Class Two Priority Tax Claims are not impaired under the Land Plan,
and are deemed to have accepted the Land Plan.  The Debtors'
Schedules reflect no Land Class Two Claims.

**6.4  Land Class Three Claims - LLIW Secured Claim.**  The
treatment of the Allowed Land Class Three LLIW Secured Claim shall
be as follows: LLIW or its designee shall receive on the Effective
Date the proceeds of the sale of the title to the Land Property, or
title to the Land Property. In the case of a winning credit bid by
LLIW or its designee, LLIW or its designee shall receive title to
the Land Property.  The Allowed Land Class Three Claim is impaired
under the Land Plan, and the Land Class Three Creditor is entitled
to vote to accept or reject the Land Plan.

**6.5  Land Class Four Claims - Unsecured Claims.**  Each holder
of an Allowed Land Class Four Claim shall receive on the Effective
Date (or as soon as practicable thereafter), or on such later date
as the Claim is allowed, its *pro rata* distribution from the Land
Distribution Fund, after the payment of Land Administration Claims,
Land Class One Claims, and Land Class Two Claims and Land Class
Three Claims from the Land Distribution Fund.  The Claims in Land

Exhibit G

**ADDENDUM TO**

**COMPLETE APPRAISAL**
**SELF-CONTAINED APPRAISAL REPORT**

OF

Madison Plaza
New York, New York
CB File No. 97-041

**PREPARED FOR**

**HERRICK FEINSTEIN**
2 Park Avenue
New York, New York 10016

**PREPARED BY**

**CB COMMERCIAL REAL ESTATE GROUP, INC.**
**APPRAISAL SERVICES**
560 Lexington Avenue, 16th Floor
New York, New York 10022



March 25, 1997

Mr. Andrew C. Gold
**HERRICK FEINSTEIN**
2 Park Avenue
New York, New York

RE: Addendum to
Appraisal of Madison Plaza
New York, New York
CB File No. 97-041

Dear Mr. Gold:

At your request CB Commercial Real Estate Group, Inc. has prepared updated cash flows on the above referenced appraisal report as of March 1, 1997. This letter serves as an addendum to our original complete self-contained appraisal report dated August 20, 1996, and should be utilized in conjunction with the aforementioned report. For this analysis, we were provided with updated financial statements for the 12 month period ended December 31, 1996, a rent roll as of February 28, 1997 and lease abstracts on all leases signed subsequent to our appraisal report. This information has been incorporated into our original cash flow analysis. Supporting exhibits, including operating expense history, historical leasing activity, recently signed leases, vacancy report and cash flows are attached to this letter.

Since our original appraisal report was prepared in August 1996, there have been no major shifts in the market or the local economy which would have an impact on value. The market rent and assumptions utilized in the updated cash flows are the same as the appraisal report. As mentioned, we were provided with year end operating expenses and therefore, projected updated operating expenses for 1997. The difference in our projected operating expenses from our original appraisal report was minimal. Since our appraisal report, the vacancy level at the subject property has increased which has had a negative impact on value. The vacancy rate increased to 37.1% as of March 1, 1997 from 33.0% in August 1996. We have outlined the changes in vacancy in each building from our original appraisal report.

| MADISON PLAZA - VACANCY | | |
|---|---|---|
| | August 1996 | March 1997 |
| 310 Madison Ave. | 25.5% | 28.8% |
| 300 Madison Ave. | 38.9% | 52.7% |
| 9-11 East 41st Street | 60.7% | 60.7% |
| 15 East 41st Street | 81.6% | 81.6% |
| Overall | 33.0% | 37.1% |



We utilized the following assumptions in our updated cash flow analysis.

## SUMMARY OF DISCOUNTED CASH FLOW ASSUMPTIONS

### General Assumptions

| | |
|---|---|
| Start Date | March 1, 1997 |
| Terms of Analysis | 11 years |
| Basis (calendar/ fiscal) | Fiscal |
| Software | Project |

### Growth Rate Assumptions

| | |
|---|---|
| General Inflation | 4.0% per annum |
| Expenses | 4.0% per annum |
| Market Rent | 3.0% year 1 |
| | 4.0% thereafter |
| Real Estate Taxes | 2.0% year 1 |
| | 4.0% thereafter |

### Market Rent Assumptions

Office Rent

| | |
|---|---|
| 310 Madison Avenue | $22.00 |
| 300 Madison Avenue | $19.00 |
| 41st Office | $15.00 |

Retail Rent

| | |
|---|---|
| 42nd Street | $75.00 |
| Corner Madison & 42nd Street | $150.00 |
| Madison Avenue | $150.00 |
| Corner Madison & 41st Street | $90.00 |
| 41st Street | $40.00 |

### Leasing Assumptions

Lease Term

| | |
|---|---|
| Office | 5 years |
| Retail - Primary | 10 years |
| Retail - Secondary | 5 years |

Renewal Probability

| | |
|---|---|
| Office | 50% |
| Retail | 50% |

Rent Escalations

| | |
|---|---|
| Office | None |
| Retail - Primary | 10% every 3 yrs |
| Retail - Secondary | None |

*Weighted Average of:*

Tenant Improvements ($/SF)

| | |
|---|---|
| New tenant - 310 Madison Avenue Office | $5.00/SF |
| Renewal tenant | $2.50/SF |
| Blended (speculative tenant) | $3.75/SF |
| | |
| New tenant - 300 Madison & 41st Office | $10.00/SF |
| Renewal tenant | $2.50/SF |
| Blended (speculative tenant) | $6.25/SF |
| Retail | "As-Is" |

| SUMMARY OF DISCOUNTED CASH FLOW ASSUMPTIONS |
| CONTINUED |

**Free Rent**

| | |
|---|---|
| New Tenant - Office | None |
| Renewal Tenant - Office | None |
| Blended | None |
| Retail | 2 Months |

**Leasing Commissions - 5 Year Deal**

| | |
|---|---|
| New tenant | 4.0% |
| Renewal tenant | 2.0% |
| Blended (speculative tenant) | 3.0% |

**Leasing Commissions - 10 Year Deal**

| | |
|---|---|
| New tenant | 3.25% |
| Renewal tenant | 1.63% |
| Blended (speculative tenant) | 2.44% |

**Downtime Between Leases (Blended)**

| | |
|---|---|
| Office - 310 Madison Avenue | 3 months |
| Office - 300 Madison Avenue & 41st St | 4 months |
| Retail | 2 months |

## Tenant Assumptions

**General**

Existing tenant leases were entered at contract rent and terms. Proforma lease terms for vacant office space assumes a five year lease term at market rent. In terms of typical escalation clauses we have assumed new tenants will sign partial gross leases, i.e., the tenant will pay real estate tax passthroughs over a base year expense, porters wage without fringe reimbursement 1¢ - 1¢ and rent inclusion electric at approximate $3.00 PSF.

## Miscellaneous Assumptions

| | |
|---|---|
| Credit Loss | 3.0% |
| Avg Vacancy Over Projection Period | 11.0% |
| Structural Maintenance/ Reserves ($/SF) | $ 0.15 |
| Capital Expense: | $506,000 Year 1 |
| | $506,000 Year 2 |

## Financial Assumptions

| | |
|---|---|
| Discount Rate (IRR) | 12.0% |
| Terminal Overall Capitalization Rate ($R_O$) | 10.0% |
| Costs of Sale | 1.0% |

Source: CB Commercial Real Estate Group, Inc.

Prepared by: CB COMMERCIAL REAL ESTATE GROUP, INC. - APPRAISAL

**MADISON PLAZA**
**NEW YORK, NEW YORK**

**DCF ANALYSIS OF THE**
**LEASED FEE INTEREST**

FISCAL YEAR ENDING FEBRUARY 28

| | 1 1998 | 2 1999 | 3 2000 | 4 2001 | 5 2002 | 6 2003 | 7 2004 | 8 2005 | 9 2006 | 10 2007 | 11 2008 | 12 2009 | 13 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | | | | | | |
| Minimum Rent | | | | | | | | | | | | | |
| Office Rent (incl. electric) | $9,040,772 | $10,383,286 | $12,335,328 | $13,799,510 | $13,802,882 | $14,129,875 | $14,881,399 | $15,499,985 | $16,710,134 | $17,043,579 | $17,102,825 | $17,837,004 | $18,675,525 |
| Dome Rooftop Rent | $500,000 | $500,000 | $500,000 | $500,000 | $558,333 | $600,000 | $600,000 | $600,000 | $600,000 | $600,000 | $600,000 | $1,195,137 | $1,201,121 |
| Free Rent | ($218,665) | ($299,807) | ($381,041) | ($5,185,333) | ($258,413) | ($156,611) | ($251,784) | ($250,780) | ($106,879) | ($155,239) | ($271,118) | ($291,459) | ($326,612) |
| **Total Minimum Rent** | $9,331,807 | $10,584,482 | $12,474,287 | $14,174,165 | $13,855,802 | $14,571,264 | $15,229,635 | $15,849,905 | $17,123,195 | $17,490,320 | $17,456,578 | $18,711,683 | $19,704,034 |
| **RECOVERIES** | | | | | | | | | | | | | |
| Real Estate Taxes | $66,350 | $69,145 | $112,830 | $171,502 | $220,664 | $298,960 | $257,691 | $256,532 | $280,725 | $348,535 | $403,443 | $391,183 | $333,797 |
| Porters Wage Reimbursement | $565,777 | $579,114 | $963,990 | $894,962 | $942,466 | $948,187 | $884,879 | $607,944 | $868,755 | $1,082,825 | $1,245,788 | $1,034,321 | $884,192 |
| Other | $67,157 | $369,770 | $858,320 | $44,346 | $71,166 | $178,922 | $61,396 | $85,916 | $90,419 | $93,061 | $93,440 | $97,500 | $102,584 |
| **Total Recoveries** | $719,292 | $717,029 | $864,940 | $1,110,819 | $1,194,413 | $1,367,770 | $1,203,966 | $1,144,832 | $1,239,906 | $1,502,421 | $1,742,051 | $1,493,004 | $1,320,573 |
| **POTENTIAL GROSS INCOME** | $10,041,199 | $11,301,711 | $13,319,227 | $15,284,795 | $15,150,015 | $15,879,034 | $16,433,603 | $18,993,537 | $18,363,085 | $18,992,741 | $19,209,221 | $20,204,687 | $21,024,607 |
| **Less:** | | | | | | | | | | | | | |
| Credit Loss | ($299,734) | ($337,273) | ($397,529) | ($456,316) | ($453,241) | ($474,084) | ($490,565) | ($507,243) | ($548,179) | ($506,992) | ($573,477) | ($603,215) | ($637,664) |
| **Plus:** | | | | | | | | | | | | | |
| Miscellaneous Income | $31,406 | $32,964 | $33,971 | $35,330 | $36,743 | $38,212 | $39,741 | $41,331 | $42,964 | $44,702 | $46,492 | $48,351 | $50,315 |
| **EFFECTIVE GROSS INCOME** | $9,772,873 | $10,997,102 | $12,955,669 | $14,863,807 | $14,734,517 | $15,443,183 | $15,982,778 | $18,527,625 | $17,857,970 | $18,479,452 | $18,682,236 | $19,649,823 | $20,447,226 |
| **EXPENSES** | | | | | | | | | | | | | |
| Management Fee | ($195,457) | ($219,943) | ($259,113) | ($297,275) | ($294,690) | ($308,863) | ($319,655) | ($330,555) | ($337,159) | ($369,409) | ($373,645) | ($392,998) | ($408,945) |
| Real Estate Taxes & BID Taxes | ($2,103,001) | ($2,215,004) | ($2,303,603) | ($2,395,746) | ($2,485,579) | ($2,591,241) | ($2,694,691) | ($2,802,680) | ($32,914,793) | ($3,031,383) | ($3,152,641) | ($3,278,746) | ($33,409,896) |
| General & Administrative | ($531,453) | ($542,317) | ($564,404) | ($555,850) | ($619,379) | ($634,435) | ($626,815) | ($606,187) | ($711,843) | ($742,191) | ($771,079) | ($802,734) | ($834,844) |
| Repairs & Maintenance | ($495,381) | ($515,196) | ($535,804) | ($557,236) | ($619,637) | ($602,708) | ($626,815) | ($651,887) | ($677,963) | ($705,081) | ($733,285) | ($762,616) | ($793,121) |
| Insurance | ($132,890) | ($139,535) | ($143,727) | ($148,472) | ($155,451) | ($161,669) | ($168,136) | ($174,861) | ($181,855) | ($190,130) | ($196,622) | ($204,563) | ($212,745) |
| Payroll | ($549,633) | ($579,570) | ($593,402) | ($617,138) | ($841,823) | ($697,466) | ($694,100) | ($833,133) | ($136,458) | ($143,999) | ($149,759) | ($155,747) | ($875,380) |
| Miscellaneous | ($101,170) | ($105,217) | ($109,425) | ($113,803) | ($118,355) | ($123,089) | ($128,012) | ($133,133) | ($136,458) | | ($32,987,884) | ($33,006,908) | ($33,156,180) |
| Utilities | ($1,985,016) | ($1,990,729) | ($2,108,163) | ($1,925,017) | ($2,002,016) | ($2,082,099) | ($2,165,393) | ($2,251,999) | ($32,342,078) | ($32,646,504) | ($32,987,884) | ($33,036,318) | ($32,738,909) |
| Service Contracts | ($1,311,236) | ($1,779,788) | ($381,661) | ($394,927) | ($398,344) | ($391,857) | ($395,532) | ($399,353) | ($103,327) | ($32,737,470) | ($32,987,884) | ($32,834,519) | ($32,738,909) |
| Advertising | ($173,500) | | | | | | | | | ($107,460) | ($111,758) | ($116,226) | ($120,875) |
| Other Expenses | ($96,730) | ($100,000) | ($100,000) | ($100,000) | ($100,000) | ($100,000) | ($100,000) | ($100,000) | $0 | $0 | $0 | $0 | $0 |
| Ground Rent | ($92,347) | ($95,411) | ($96,910) | ($98,853) | ($81,226) | ($63,888) | ($66,225) | ($68,650) | ($100,000) | ($100,000) | ($100,000) | ($100,000) | ($100,000) |
| Reserves | ($7,731,735) | ($8,200,413) | ($9,708,616) | ($9,148,764) | ($88,658,434) | ($88,803,079) | ($88,220,104) | ($10,640,513) | ($211,640) | ($211,640) | ($177,488) | ($260,565) | ($283,809) |
| **Total Operating Expenses** | ($7,731,735) | ($8,200,413) | ($9,708,616) | ($9,148,764) | ($88,658,434) | ($88,803,079) | ($88,220,104) | ($10,640,513) | ($11,526,209) | ($11,526,209) | ($11,000,042) | ($12,300,250) | ($12,000,072) |
| **NOI Before Capital Items** | $2,041,138 | $2,797,689 | $4,348,853 | $5,715,053 | $6,376,083 | $6,640,193 | $5,762,675 | $5,887,112 | $6,748,842 | $6,944,193 | $6,782,394 | $7,366,543 | $7,946,555 |
| **Capital Costs** | | | | | | | | | | | | | |
| Capital Expenditures | ($506,000) | ($506,000) | $0 | $0 | $0 | $0 | $0 | ($594,259) | $0 | ($292,527) | ($306,553) | ($343,910) | ($192,000) |
| Alterations | ($498,249) | ($826,130) | ($1,274,460) | ($272,218) | ($226,103) | ($385,554) | ($854,360) | ($645,577) | ($449,912) | ($274,908) | ($177,488) | ($682,683) | ($849,203) |
| Commissions | ($300,651) | ($409,419) | ($546,847) | ($185,882) | ($855,998) | ($238,465) | ($645,629) | | ($530,920) | | ($11,309,842) | ($12,303,250) | ($12,000,072) |
| **CASH FLOW** | $736,141 | $1,298,159 | $2,427,746 | $5,254,853 | $5,295,982 | $5,096,164 | $4,712,686 | $4,646,977 | $6,098,976 | $6,376,723 | $6,665,390 | $5,829,922 | $6,104,743 |

**VALUATION OF THE LEASED FEE INTEREST: As of March 1, 1997**

NPV of the annual cash flow:
Holding period in # of years: 11
Discount rate: 12.00%
NPV of NOI, FY 1998-2008: $21,847,565

Calculation of the lump sum reversion:
12th year NOI (Less Dumm Roofs & ...) $5,800,406
Ground Lease Pmt)
Reversionary cap. rate: 10.0%
Reversion: $58,000,000
Less:
Selling Costs (1%): ($580,041)
Alterations ($842,503)
Commissions ($652,823)
Net Sale Price $57,787,296

Value is calculated as:
NPV of the Annual HCF (Yr 12-21): $21,847,505
NPV of 209 reversion (Yr 12-21): $12,011,284
NPV of the Reversion: $18,608,718
MARKET VALUE: $40,265,556
ROUNDED TO: $40,000,000

Going-in Cap Rate: 5.1%
Stabilized Cap Rate: 14.3%
Price Per SF: $77

Distribution: 54% / 41% / 85%

### Cash Flow Summary

We used "PRO-JECT +plus" computer software to create a cash flow model for a long term hold. Reference is made to the "Annual Cash Flow Report", generated by the Pro-ject software, on the previous page which provides a summary of cash flow from all sources. We utilized an 11 year holding period and have discounted the cash flow on a fiscal year basis from 1998 to 2008. The cash flow incorporates the terms of existing leases during the analysis period and our assumptions regarding the lease-up of vacant space. It also calculates renewal rentals when leases expire based on current market rent escalated at a growth factor. We capitalized the 12th year NOI to determine the reversionary value at the end of year 11.

As discussed in our original appraisal report, given the fact that the ground lease will expire in approximately 21 years and will revert back to the fee holder, it is not appropriate to capitalize the income and expense attributed to 306 Madison Avenue into our reversionary value. Therefore, we have separated out the income and expense attributed to 306 Madison Avenue and have discounted the cash flow through the end of the ground lease term. The present value of the net cash flow from this site is added to the value of the subject property.

Based upon our analysis we have selected a discount of 12.0% and a terminal capitalization rate of 10.0%. The indicated market value of the fee simple interest subject to existing leases in the subject property, via the income approach, as of March 1, 1997 is:

### "AS-IS" ASSUMING CONTINUED USE AS AN OFFICE BUILDING COMPLEX

### --- FORTY MILLION DOLLARS ---
### ($40,000,000)

This value represents a decline of 2.4% from our original valuation which produced a value of $41,000,000. This decrease can be attributed to the increased vacancy rate at the subject property. It should be noted that our concluded opinion of the underlying land value given the potential redevelopment of the site when the market justifies construction *assuming fee simple ownership*, subject remains unchanged at $55,000,000.

Further, we uncovered a few recent sales subsequent to our August 1996 appraisal report. These sales indicated a price per square foot range from $87 to $111 per square foot and are shown below.

| SUMMARY OF COMPARABLE SALES | | | | | | | |
|---|---|---|---|---|---|---|---|
| SALE NO. | ADDRESS | SALE DATE | SIZE/NRA | YEAR BUILT | SALE PRICE | PRICE/SF | OAR |
| 1 | 475 Fifth Avenue | 12/96 | 232,808 | 1925 | $25,850,000 | $111 | 11.9% |
| 2 | 260-261 Madison Ave. | 9/96 | 856,841 | 1952-1954 | $75,000,000 | $87 | 13.2% |
| 3 | 220 East 42nd St. | 9/96 | 1,096,310 | 1929 | $103,000,000 | $94 | N/A |

Given the fact that the subject property represents an income producing property, we placed the most weight on the Income Capitalization approach to value.

It has been a pleasure to assist you in this assignment. If you have any questions concerning the analysis, or if CB Commercial Real Estate Group, Inc. can be of further service, please do not hesitate to contact us.

Respectfully Submitted,

**CB COMMERCIAL REAL ESTATE GROUP, INC.**
**APPRAISAL SERVICES**

by:

Helene B. Jacobson, MAI
Assistant Vice President
New York State Certification No. 46-26005

Michael R. Pecorino, MAI
Senior Vice President
Northeast Regional Manager
New York State Certification No. 46-2055